# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUILLERMO OLVERA,<br><br>Petitioner,<br><br>vs.<br><br>DAVID LONG, Warden<br><br>Respondent. | Civil No.   12-cv-01433-WQH (MDD)<br><br>**REPORT AND RECOMMENDATION RE: PETITION FOR WRIT OF HABEAS CORPUS** |

## I. INTRODUCTION

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California. After reviewing the Petition (ECF No. 1), Respondent's Answer and Memorandum of Points and Authorities in support thereof (ECF No. 8), Petitioner's Traverse (ECF No. 15), and the supporting documents and pertinent state court Lodgments, the Court **RECOMMENDS** the Petition be **DENIED** for reasons stated below.

## II. PROCEDURAL HISTORY

On June 29, 2009, a jury convicted Guillermo Olvera ("Petitioner") of second degree murder and found true an allegation that he personally used a knife when he committed the offense. (*See* Lodgment 6 at 1). On July 28, 2009, the trial court sentenced Petitioner to 15 years to life in prison for the murder conviction and a consecutive one year term for the weapon use enhancement. (*Id.*).

On appeal, Petitioner contended that the trial court's instruction on voluntary intoxication misled the jury. (*Id.* at 2). Petitioner also contended there was insufficient evidence to support the jury's true finding on the weapon use enhancement. (*Id.*). On May 12, 2011, the California Court of Appeal affirmed the trial court judgment. (*Id.*).

Petitioner, making the same claims, appealed to the California Supreme Court. (Lodgment 7). On August 17, 2011, the California Supreme Court denied the appeal without comment or citation. (Lodgment 8).

Petitioner filed the instant petition in this Court on June 12, 2012. (ECF No. 1). Petitioner contends that the trial court violated his due process rights under the Fifth and Fourteenth Amendments by not properly instructing the jury. (*Id.* at 12–13).

## III. STATEMENT OF FACTS

"[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The court must be "particularly deferential to [its] state-court colleagues." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). Accordingly, we presume

12-cv-01433-WQH (MDD)

the following facts taken from the California Court of Appeal's opinion to be correct:

*Prosecution Evidence*

> Maria Ortega and her husband Gabino Rosas hosted a party in the courtyard of their apartment building. Among the attendees were Ortega's brothers; Ortega's sister and her family, including her common-law husband Jose Velasquez; and [Petitioner] and his family, including his common-law wife, his two brothers, and his brother-in-law. Ortega's teenage neighbor, D.F., and her family also attended the party. Rosas, [Petitioner], Velasquez, and most of the other men at the party were drinking beer. A neighbor thought everyone appeared drunk.
> At some point, several men, including Rosas, [Petitioner]'s brothers, and [Petitioner]'s brother-in-law, started pushing and punching one another. There was conflicting evidence about whether [Petitioner] and Velasquez joined in the fight. There was no dispute, however, that both [Petitioner] and his wife attempted to break up the fight, that [Petitioner] was ultimately successful in ending it, and the parties reconciled.
> After the fight, Ortega told her brothers and Velasquez to leave. They and Ortega's sister went out to the alley. [Petitioner], his brothers, and his brother-in-law went to [Petitioner]'s apartment. [Petitioner]'s father, who also lived there, told [Petitioner]'s brothers and brother-in-law to leave and escorted them outside. [Petitioner] left with them.
> Meanwhile, D.F. and her family started cleaning up the courtyard. [Petitioner]'s wife subsequently joined them. While they were cleaning, they heard a loud crash coming from the front of the apartment building. D.F. went with [Petitioner]'s wife to see what happened. D.F. saw Velasquez on his knees. She also saw [Petitioner] punch Velasquez in the back and shoulder on the left side about five times. D.F.

12-cv-01433-WQH (MDD)

- 3 -

did not see a knife, weapon, or anything else in [Petitioner]'s hand. There were three other men in the area, including [Petitioner]'s brother-in-law. One of them, [Petitioner]'s father, tried to pull the other two away.

D.F. briefly turned away because she did not want to see what was happening. When she looked back again, she saw Velasquez, who was bleeding, stand up and then fall sideways. [Petitioner] and the other men were gone.

. . . .

Around the same time D.F. and her family were cleaning up the courtyard, Loc Lai arrived to visit a friend who lived in an apartment building across the street from [Petitioner]'s apartment building. Lai saw a woman standing by the passenger side of Velasquez's truck. The two were talking loudly with each other through the open passenger side window. A man ran from the parking lot of [Petitioner]'s apartment building to the driver's side of the truck. The man spoke briefly to Velasquez and then punched Velasquez through the driver's side window. A short time later, two other men came running to the truck from the same direction as the first man. They also punched Velasquez and tried to pull him out of the truck.

As they were doing that, the first man ran over to the passenger side. He tried to open the passenger side door and punch through the now-closed passenger side window with his elbow. Velasquez tried to back up the truck and almost hit another car. The men then pulled Velasquez from the still-running truck and started hitting and kicking him.

Velasquez did not fight back. He tried to get up and get away, but one of the men knocked him down by striking him in the head with a metal bar as the other men continued hitting and kicking him. The three men then ran to the parking lot of [Petitioner]'s apartment complex. Two of the men got into a van and drove off. The other man got into a sedan and drove off in the same direction as the van. The woman got into another car and drove off, following them.

. . . .

When police officers arrived at the scene, they found Velasquez lying face down in the street. Velasquez had blood coming from his mouth and on his chest. Police officers found a baseball cap and a closed folding knife lying in the street approximately five feet from Velasquez.[1] Both items had blood on them. In addition, police officers found a trail of blood from Velasquez's body to the bedroom in [Petitioner]'s apartment, and a set of bloody footprints leading from the apartment to the parking lot. They also found a two-foot-long metal bar in the bushes near [Petitioner]'s apartment. Velasquez was the major contributor to the DNA mixture in the blood on the folding knife and he could not be excluded as a source of the DNA on the shaft of the metal bar. [Petitioner] was excluded as a source of the DNA on the shaft of the metal bar; however, his DNA matched the DNA in the blood on the baseball cap and in the blood trail.

While police officers were investigating what happened to Velasquez, a man reported a collision involving a sedan two blocks down from [Petitioner]'s apartment building. When police officers arrived at the collision scene, [Petitioner] was sitting in the driver's seat of the sedan, bleeding from his right leg. The trauma surgeon who treated [Petitioner] testified [Petitioner] had a stab wound on his right leg about two inches above the knee on the outside of his thigh. He had no defensive or other wounds. His blood alcohol level at the time of treatment was .15 percent. Although he was slightly drowsy, he could answer questions appropriately and did not appear to have any neurologic deficit. His Glascow Coma Score, which is used to evaluate mental status, was 15. This is the best possible score and is given to "someone awake like all of us."

In the front driver side of the sedan, police officers found a 13-inch knife with blood on it. Velasquez's DNA matched the DNA in the blood on one part of the knife blade. Neither Velasquez nor [Petitioner] could be excluded as contributors to

---

[1] Velasquez's belt had a knife holder on it. The knife holder was unsnapped and the folding knife fit inside it.

the DNA mixture in the blood on another part of the knife blade. [Petitioner] was excluded, but Velasquez could not be excluded as a contributor to DNA found on the knife handle.

Police officers also found blood on [Petitioner]'s shirt and shoes. [Petitioner] was included as a major contributor and Velasquez was included as a minor contributor to the DNA mixture in the blood on [Petitioner]'s shoes. Velasquez's DNA matched the DNA in two bloodstains found on the front of [Petitioner]'s shirt. Velasquez was included as a major contributor to the DNA mixtures in bloodstains found on the lower left front, the left shoulder, and the right sleeve of the shirt.

A deputy medical examiner determined Velasquez died from multiple stab wounds to the torso. The wounds included a two and three-quarter inch deep stab wound on his abdomen, a six and one-quarter inch deep stab wound on his left back near his shoulder, and a nine and three-quarter inch deep stab wound slightly below his left nipple that went through his heart and into his left lung. In addition, he had been struck in the head twice with a blunt object consistent with being the metal bar that police found in the bushes near [Petitioner]'s apartment. Velasquez also had several scrapes, bruises, and knife cuts, which were consistent with being defensive wounds. The knife found in the sedan [Petitioner] was driving was consistent with having caused Velasquez's stab wounds and knife cuts, as well as the stab wound on [Petitioner]'s leg.[2]

Velasquez's blood alcohol level when he died was .26 percent. He also had .02 milligrams per milliliter of cocaine and .06 milligrams per milliliter of methamphetamine in his system. These levels are consistent with recent use.

*Defense Evidence*

[Petitioner]'s father, brothers, and brother-in-law have

---

[2] The prosecutor's theory was that [Petitioner] accidentally stabbed himself while he was stabbing Velasquez.

12-cv-01433-WQH (MDD)

not been seen or heard from since the night of Velasquez's death.  They are believed to be in Mexico.

[Petitioner]'s sister heard the fighting on the street and was in the apartment when [Petitioner], their brothers, their brother-in-law, and their father came in afterward.  She heard them and [Petitioner]'s wife arguing.  She saw [Petitioner] bleeding, but she did not see him with a knife.  Her father, brothers, and brother-in-law left.  Then, [Petitioner] left.

Rosas testified he did not see not see [*sic*] anyone with a knife or a metal bar during the initial altercation.  Ortega's brother testified Velasquez was upset that night because Ortega's brother told Velasquez that Velasquez's wife was going to leave him.  Velasquez was acting "weird," as he does when he has been drinking.  Ortega's brother did not see Velasquez using drugs.

A forensic chemist testified about the effects of alcohol, cocaine and methamphetamine on the nervous system.  He explained that a person with a .15 blood alcohol level would have impaired judgment and exaggerated emotional states.  A person with a .26 blood alcohol would have even more impaired judgment and exaggerated emotional states.  In addition, the person would experience short-term memory loss.  A person with a .26 blood alcohol level plus .02 milligrams per milliliter of cocaine and .06 milligrams per milliliter of methamphetamine in his or her system would experience gross mental impairment, be unable to control any aggressive tendencies, make poor decisions, and have poor judgment.  The person would also be completely unable to mentally or physically perform motor skills.

[Disputed] *Jury Instruction*

Using a tailored version of CALCRIM No. 625, the trial court instructed the jury: You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only deciding whether the defendant acted with the intent to kill or the defendant acted

with deliberation and premeditation. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. *You may not consider evidence of voluntary intoxication for any other purpose.* (Emphasis added).[3]

The trial court [also] instructed the jury to consider evidence of provocation in deciding whether [Petitioner] committed first versus second degree murder, and whether he committed murder versus voluntary manslaughter. The trial court further instructed the jury to consider "all the circumstances as they were known or appeared" to Petitioner in deciding whether Petitioner acted in self-defense or imperfect self-defense.

(Lodgment 6 at 2–9 (as quoted by the Court of Appeal, with minor edits for clarity)).

//

//

---

[3] In its untailored form, CALCRIM No. 625 provides:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant <*insert other specific intent required in a homicide charge or other charged offense*>.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

# IV. STANDARD OF REVIEW

28 U.S.C. § 2254(a), provides the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgement of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

As amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, 28 U.S.C. § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

When determining what constitutes "clearly established federal law" under § 2254(d)(1), federal courts look to United States Supreme Court holdings at the time of the state court's decision. *Lockyer v.*

*Andrade*, 538 U.S. 63, 71–72 (2003). A state court's decision is "contrary to" clearly established United States Supreme Court precedent if (1) the state court applies a rule different from the governing law set forth in Supreme Court cases, or (2) the state court confronts a set of facts that are materially indistinguishable from a Supreme Court case, but still reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer*, 538 U.S. at 76. Instead, the state court's application must be "objectively unreasonable." *Id*. Petitioner bears the burden of proving the state court acted in an unreasonable, or contrary manner. *Woodford v. Visciotti*, 537 U.S. 19, 21 (2002). A state court decision does not have to demonstrate an awareness of clearly established Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradict such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

When a petition for review is made to the highest state court and the court responds with a silent denial, the federal habeas court can "look through" the silent denial to the last reasoned state court decision in order to consider whether habeas relief is warranted. *Ylst v. Nunnenmaker*, 501 U.S. 797, 803–04 (1991). When a state court does not supply reasoning for a decision, an independent review of the record is required to determine if the court clearly erred in applying controlling

12-cv-01433-WQH (MDD)

- 10 -

federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000). In the instant case, Petitioner submitted a petition for review to the California Supreme Court, and the California Supreme Court issued a silent denial. (Lodgment 8). Therefore, we look through to the decision of the California Court of Appeal.

"Failure to give [a jury] instruction which might be proper as a matter of state law," by itself, "does not amount to a federal constitutional violation" meriting federal habeas relief. *Miller v. Stagner*, 757 F.2d 988, 993 (9th Cir.1985). Rather, the Court would have to conclude that the error "so infected the entire trial that the resulting conviction violate[d] due process." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Due process is violated if there is a reasonable likelihood the jury applied the instruction in a way that violated the Constitution. *Estelle v. McGuire*, 502 U.S. 62, 68 (1972).

## V.  DISCUSSION

Petitioner contends the trial court violated his due process rights under the Fifth and Fourteenth Amendments by providing misleading instructions to the jury. (ECF No. 1 at 12–13). Petitioner contends the trial court should have made clear that the jury could consider the relevance of Velasquez's intoxication and the affect it may have had on Petitioner's state of mind. (*Id.* at 15). Petitioner maintains that

additional instruction was important because once the jury decided that Petitioner had stabbed Velasquez, they were required to determine Petitioner's intent at the time of the stabbing. Petitioner's intent at the time of the stabbing bears on Petitioner's degree of legal culpability. (*Id.*).

Petitioner claims that the instructions given to the jury erroneously precluded consideration of how Velasquez's intoxication may have caused Petitioner to act in self-defense or induced Petitioner to fight. The instruction Petitioner finds fault in reads as follows:

> You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose.

(Lodgment 6 at 8–9) (ECF No.1 at 15–16).

Petitioner contends that the last line of the instruction is misleading. When the trial judge stated "[y]ou may not consider evidence of voluntary intoxication for any other purpose," Petitioner claims such instruction precluded the jury from considering the role Velasquez's intoxication played in the altercation between Velasquez and Petitioner. Therefore, according to Petitioner, he did not have the opportunity to

present a complete defense. Further, Petitioner claims that this alleged error had a substantial effect on the verdict. (ECF No.1 at 24).

**Due Process Standard**

A criminal defendants due process right to a trial requires that they be given a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Matthews v. United States*, 485 U.S. 58, 63 (1988). However, in order to merit federal habeas relief, alleged errors in state court jury instructions must have "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72.

The Ninth Circuit has held that the failure to instruct on a defense theory is only grounds for habeas relief if the theory is legally sound and there is supporting evidence. *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004). Additionally, even where constitutional error is found, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*." *Fry v. Piller*, 551 U.S. 112, 121–22 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). "Under [the *Brecht*] standard, an error requires reversal only if it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 631 (quoting *Kotteakos v. United*

12-cv-01433-WQH (MDD)

- 13 -

*States*, 328 U.S. 750, 776 (1946)).

**State Decision on Appeal**

The Court of Appeal reviewed Petitioner's claim and found it meritless.[4] (Lodgment 6 at 9). The Court reviewed the disputed instruction as a whole and concluded that the challenged language, considered in context, only related to *Petitioner's* voluntary intoxication. (*Id.* at 10). As such, the Court found that the limitation expressed in the voluntary intoxication instruction would not have misled the jury with regard to Velasquez's intoxication.

The Court of Appeal noted that the trial court also instructed the jury to consider "all the circumstances as they were known or appeared" to Petitioner in deciding whether Petitioner acted in self-defense or imperfect self-defense. (*Id.*). Furthermore, the trial court instructed the jury to consider evidence that Velasquez provoked Petitioner when determinating of Petitioner's degree of legal culpability. (*Id.*). The Court of Appeal found that these instructions could only be reasonably understood as relating to the affect of Velasquez's conduct on Petitioner. These instructions did not limit the jury's consideration of Velasquez's intoxication. Thus, reading the jury instructions together, the Court of Appeal held that a reasonable jury would not understand the challenged

---

[4] As an initial matter, the Court of Appeal concluded that Petitioner forfeited his jury instruction claim when trial counsel did not offer a timely objection to the instruction. Despite concluding that the claim was forfeited, the Court reviewed the claim on the merits.

12-cv-01433-WQH (MDD)

1 language as limiting its ability to consider evidence of Velasquez's
2 intoxication. (*Id.* at 9–11).

3 Finally, the Court of Appeal concluded that even if the trial court
4 had erred, such error would be harmless. (*Id.* at 11). The Court of
5 Appeal based its conclusion on the fact that, despite expert testimony
6 that a person with Velasquez's level of intoxication and recent drug use
7 would have "grossly impaired judgment" and an "inability to control any
8 aggressive tendencies," there was no evidence Velasquez did anything to
9 provoke Petitioner, or to cause Petitioner to reasonably or unreasonably
10 believe he needed to act in self-defense. (*Id.*).

**Analysis**

The Court of Appeal's opinion is neither contrary to nor an unreasonable application of clearly established federal law. In order for Petitioner to obtain habeas relief, Petitioner must demonstrate that the jury instruction foreclosed a defense theory for which there was sufficient supporting evidence. *Beardslee*, 358 F.3d at 577. Upon that showing, Petitioner must further show "that the alleged error had a substantial or injurious effect on the verdict." *Brecht,* 507 U.S. at 623. Petitioner has not met this burden.

The Court of Appeal was not unreasonable in its conclusion that the trial court's tailored version of CALCRIM No. 625, taken in context, as a whole, and alongside additionally provided jury instructions, did not limit the jury's consideration of evidence that Petitioner was provoked by

12-cv-01433-WQH (MDD)

Velasquez. The Court of Appeal also reasonably concluded that the disputed instruction did not preclude the jury from considering the entire mix of evidence, including Velasquez's intoxication, which bore on Petitioner's legal culpability. Specifically, the instruction to consider "all circumstances as they were known or appeared" to Petitioner, placed no limit on the jury's consideration of Velasquez's intoxication and how that intoxication might have caused Petitioner to act in self-defense. (Lodgment 6 at 10). Petitioner's theory that Velasquez must have been the aggressor due to his intoxication was fully available for the jury to consider had there been any evidence before them to support it.

Even if Petitioner were to show that the trial court erred by not specifically instructing the jury about Velasquez's intoxication, Petitioner has not shown that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 637–38. The Court of Appeal, reviewing the trial court record, found no evidence that Velasquez did anything to provoke Petitioner, or to cause Petitioner to reasonably or unreasonably believe he needed to act in self-defense. (Lodgment 6 at 11 ("[T]here is no evidence Velasquez did anything to provoke [Petitioner], or to cause [Petitioner] to reasonably or unreasonably believe he needed to act in self-defense.")) This finding comports with a reasonable reading of the trial court transcripts. (Lodgment No. 2 at 151–60, 191–92, 369–74, 417).

Petitioner makes two unpersuasive attempts to rebut evidence that

1 Velasquez did not act aggressively. First, Petitioner points to the testimony of his expert witness. Dewayne Beckner, a forensic chemist, testified that a person intoxicated similarly to Velasquez would experience "gross mental impairment," would "be making poor decisions," and if "normally [they] would be aggressive but would have those tendencies under control [they] no longer would have those tendencies under control." (Lodgment No. 2 at 911).

Second, Petitioner attempts to relitigate the facts by introducing hypotheticals that characterize Velasquez as being the aggressor. (ECF No. 1 at 15–16, 25). Instead of pointing to evidence in the record showing Velasquez was the aggressor, Petitioner instead makes the error of conflating intoxication with aggression. While Petitioner fixates on the evidence that Velasquez was intoxicated, he ignores the factual finding that Velasquez never acted in an aggressive manner. (Lodgment 6 at 11–12). The Court finds that the Court of Appeal was not unreasonable in concluding that even if the trial court erred, the error would be he harmless. Such error would not have had a substantial and injurious effect or influence upon the jury's verdict because there was little if any evidence that Velasquez acted in an aggressive manner towards Petitioner. *See Brecht*, 507 U.S. at 631; (Lodgment No. 6 at 11–12).

Accordingly, the Court **RECOMMENDS** the Petition be **DENIED**.

## V. CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United

12-cv-01433-WQH (MDD)

States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

For all the foregoing reasons, **IT IS RECOMMENDED** that the District Court issue an Order: (1) approving and adopting this Report and Recommendation and (2) denying Petitioner's petition for writ of habeas corpus.

**IT IS HEREBY ORDERED** no later than June 21, 2013, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and served on all parties no later than July 5, 2013. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED**.

DATED: June 6, 2013

*[signature]*
Hon. Mitchell D. Dembin
U.S. Magistrate Judge

12-cv-01433-WQH (MDD)