**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GUILLERMO OLVERA,<br><br>　　　　　Petitioner,<br>vs.<br>DAVID LONG, Warden,<br><br>　　　　　Respondent. | CASE NO. 12cv1433-WQH-MDD<br><br>**ORDER** |

HAYES, Judge:

   The matters before the Court are the Report and Recommendation (ECF No. 16) issued by United States Magistrate Judge Mitchell D. Dembin recommending that the Court deny the Petition for Writ of Habeas Corpus (ECF No. 1), and the Objections (ECF No. 20) and Application for Certificate of Appealability (ECF No. 19) filed by Petitioner Guillermo Olvera.

**BACKGROUND FACTS[1]**

**I.    Prosecution Evidence**

   Maria Ortega and her husband Gabino Rosas hosted a party in the courtyard of their apartment building. Among the attendees were Ortega's brothers; Ortega's sister and her family, including her common-law husband Jose Velasquez; and [Petitioner] and his family, including his common-law wife, his two brothers, and his brother-in-law. Ortega's teenage neighbor, D.F., and her family also attended the party. Rosas,

---

[1] The Court recites the facts according to the factual findings of the California Court of Appeal, which Petitioner does not dispute. *See* 28 U.S.C. § 2254(e)(1) (a presumption of correctness attaches to state court determinations of factual issues).

[Petitioner], Velasquez, and most of the other men at the party were drinking beer. A neighbor thought everyone appeared drunk.

At some point, several men, including Rosas, [Petitioner]'s brothers, and [Petitioner]'s brother-in-law, started pushing and punching one another. There was conflicting evidence about whether [Petitioner] and Velasquez joined in the fight. There was no dispute, however, that both [Petitioner] and his wife attempted to break up the fight, that [Petitioner] was ultimately successful in ending it, and the parties reconciled.

After the fight, Ortega told her brothers and Velasquez to leave. They and Ortega's sister went out to the alley. [Petitioner], his brothers, and his brother-in-law went to [Petitioner]'s apartment. [Petitioner]'s father, who also lived there, told [Petitioner]'s brothers and brother-in-law to leave and escorted them outside. [Petitioner] left with them.

Meanwhile, D.F. and her family started cleaning up the courtyard. [Petitioner]'s wife subsequently joined them. While they were cleaning, they heard a loud crash coming from the front of the apartment building. D.F. went with [Petitioner]'s wife to see what happened. D.F. saw Velasquez on his knees. She also saw [Petitioner] punch Velasquez in the back and shoulder on the left side about five times. D.F. did not see a knife, weapon, or anything else in [Petitioner]'s hand. There were three other men in the area, including [Petitioner]'s brother-in-law. One of them, [Petitioner]'s father, tried to pull the other two away.

D.F. briefly turned away because she did not want to see what was happening. When she looked back again, she saw Velasquez, who was bleeding, stand up and then fall sideways. [Petitioner] and the other men were gone....

Around the same time D.F. and her family were cleaning up the courtyard, Loc Lai arrived to visit a friend who lived in an apartment building across the street from [Petitioner]'s apartment building. Lai saw a woman standing by the passenger side of Velasquez's truck. The two were talking loudly with each other through the open passenger side window. A man ran from the parking lot of [Petitioner]'s apartment building to the driver's side of the truck. The man spoke briefly to Velasquez and then punched Velasquez through the driver's side window. A short time later, two other men came running to the truck from the same direction as the first man. They also punched Velasquez and tried to pull him out of the truck.

As they were doing that, the first man ran over to the passenger side. He tried to open the passenger side door and punch through the now-closed passenger side window with his elbow. Velasquez tried to back up the truck and almost hit another car. The men then pulled Velasquez from the still running truck and started hitting and kicking him.

Velasquez did not fight back. He tried to get up and get away, but one of the men knocked him down by striking him in the head with a metal bar as the other men continued hitting and kicking him. The three men then ran to the parking lot of [Petitioner]'s apartment complex. Two of the men got into a van and drove off. The other man got into a sedan and drove off in the same direction as the van. The woman got into another car and drove off, following them....

When police officers arrived at the scene, they found Velasquez lying face down in the street. Velasquez had blood coming from his mouth and on his chest. Police officers found a baseball cap and a closed folding knife lying in the street approximately five feet from Velasquez.[2] Both items had blood on them. In addition, police officers found a trail of blood from Velasquez's body to the bedroom in [Petitioner]'s apartment, and a set of bloody footprints leading from the apartment to the parking lot. They also found a two-foot-long metal bar in the bushes near [Petitioner]'s apartment. Velasquez was the major contributor to the DNA mixture in the blood on the folding knife and he could not be excluded as a source of the DNA on the shaft of the metal bar. [Petitioner] was excluded as a source of the DNA on the shaft of the metal bar; however, his DNA matched the DNA in the blood on the baseball cap and in the blood trail.

While police officers were investigating what happened to Velasquez, a man reported a collision involving a sedan two blocks down from [Petitioner]'s apartment building. When police officers arrived at the collision scene, [Petitioner] was sitting in the driver's seat of the sedan, bleeding from his right leg. The trauma surgeon who treated [Petitioner] testified [Petitioner] had a stab wound on his right leg about two inches above the knee on the outside of his thigh. He had no defensive or other wounds. His blood alcohol level at the time of treatment was .15 percent. Although he was slightly drowsy, he could answer questions appropriately and did not appear to have any neurologic deficit. His Glascow Coma Score, which is used to evaluate mental status, was 15. This is the best possible score and is given to 'someone awake like all of us.'

In the front driver side of the sedan, police officers found a 13-inch knife with blood on it. Velasquez's DNA matched the DNA in the blood on one part of the knife blade. Neither Velasquez nor [Petitioner] could be excluded as contributors to the DNA mixture in the blood on another part of the knife blade. [Petitioner] was excluded, but Velasquez could not be excluded as a contributor to DNA found on the knife handle.

Police officers also found blood on [Petitioner]'s shirt and shoes. [Petitioner] was included as a major contributor and Velasquez was included as a minor contributor to the DNA mixture in the blood on [Petitioner]'s shoes. Velasquez's DNA matched the DNA in two bloodstains found on the front of [Petitioner]'s shirt. Velasquez was included as a major contributor to the DNA mixtures in bloodstains found on the lower left front, the left shoulder, and the right sleeve of the shirt.

A deputy medical examiner determined Velasquez died from multiple stab wounds to the torso. The wounds included a two and three-quarter inch deep stab wound on his abdomen, a six and one-quarter inch deep stab wound on his left back near his shoulder, and a nine and three-quarter inch deep stab wound slightly below his left nipple that went through his heart and into his left lung. In addition, he had been struck in the head twice with a blunt object consistent with being the metal bar that police found in the bushes near [Petitioner]'s apartment. Velasquez also had several scrapes, bruises, and knife cuts, which were consistent with

---

[2] Velasquez's belt had a knife holder on it. The knife holder was unsnapped and the folding knife fit inside it.

being defensive wounds. The knife found in the sedan [Petitioner] was driving was consistent with having caused Velasquez's stab wounds and knife cuts, as well as the stab wound on [Petitioner]'s leg.[3]

Velasquez's blood alcohol level when he died was .26 percent. He also had .02 milligrams per milliliter of cocaine and .06 milligrams per milliliter of methamphetamine in his system. These levels are consistent with recent use.

## II. Defense Evidence

[Petitioner]'s father, brothers, and brother-in-law have not been seen or heard from since the night of Velasquez's death. They are believed to be in Mexico.

[Petitioner]'s sister heard the fighting on the street and was in the apartment when [Petitioner], their brothers, their brother-in-law, and their father came in afterward. She heard them and [Petitioner]'s wife arguing. She saw [Petitioner] bleeding, but she did not see him with a knife. Her father, brothers, and brother-in-law left. Then, [Petitioner] left.

Rosas testified he did not see ... anyone with a knife or a metal bar during the initial altercation. Ortega's brother testified Velasquez was upset that night because Ortega's brother told Velasquez that Velasquez's wife was going to leave him. Velasquez was acting 'weird,' as he does when he has been drinking. Ortega's brother did not see Velasquez using drugs.

A forensic chemist testified about the effects of alcohol, cocaine and methamphetamine on the nervous system. He explained that a person with a .15 blood alcohol level would have impaired judgment and exaggerated emotional states. A person with a .26 blood alcohol would have even more impaired judgment and exaggerated emotional states. In addition, the person would experience short-term memory loss. A person with a .26 blood alcohol level plus .02 milligrams per milliliter of cocaine and .06 milligrams per milliliter of methamphetamine in his or her system would experience gross mental impairment, be unable to control any aggressive tendencies, make poor decisions, and have poor judgment. The person would also be completely unable to mentally or physically perform motor skills.

## III. Challenged Jury Instructions

Using a tailored version of CALCRIM No. 625, the trial court instructed the jury: You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only deciding whether the defendant acted with the intent to kill or the defendant acted with deliberation and premeditation. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. *You may not consider evidence of voluntary intoxication for any other*

---

[3] The prosecutor's theory was that [Petitioner] accidentally stabbed himself while he was stabbing Velasquez.

> *purpose*. (Emphasis added).
>
> The trial court [also] instructed the jury to consider evidence of provocation in deciding whether [Petitioner] committed first versus second degree murder, and whether he committed murder versus voluntary manslaughter. The trial court further instructed the jury to consider "all the circumstances as they were known or appeared" to Petitioner in deciding whether Petitioner acted in self-defense or imperfect self-defense.

(Lodgment 6 at 2–9).

## PROCEDURAL HISTORY

On June 29, 2009, a San Diego Superior Court jury found Petitioner Guillermo Olvera guilty of second degree murder, and found true the allegation that Petitioner personally used a knife in committing the offense. (*See* Lodgment 6 at 1). On July 28, 2009, the state trial court sentenced Petitioner to 15 years to life in prison for the murder conviction, and a consecutive one year term for the weapon enhancement. *Id.*

Petitioner directly appealed his conviction to the California Court of Appeal on the grounds that the trial court's instruction on voluntary intoxication misled the jury and that insufficient evidence existed to support the jury's finding on the weapon use enhancement. *Id.* at 2. On May 12, 2011, the California Court of Appeal affirmed the trial court judgment. *Id.*

Petitioner appealed to the California Supreme Court on the same grounds that he based his appeal to the California Court of Appeal. (Lodgment 7). On August 17, 2011, the California Supreme Court summarily denied the appeal. (Lodgment 8).

On June 12, 2012, Petitioner filed the Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 in this Court, alleging one claim for relief. (ECF No. 1). Petitioner alleges that he "was deprived of his right to due process, the right to a fair trial, and to present a complete defense under the Fifth and Fourteenth Amendments of the United States Constitution because he was wrongfully convicted for second degree murder based on an erroneous court instruction which prohibited jurors from considering evidence of Velasquez's intoxication on Petitioner's mental state." *Id*. at 14.

On September 25, 2012, Respondent David Long filed an Opposition to the Petition. (ECF No. 8). On December 20, 2012, Petitioner filed a Traverse. (ECF No. 15).

On June 6, 2013, the Magistrate Judge issued the Report and Recommendation (ECF No. 16), recommending that the Court deny the Petition.

On August 19, 2013, Petitioner filed Objections (ECF No. 20) to the Report and Recommendation, along with an Application for Certificate of Appealability (ECF No. 19).

## STANDARDS OF REVIEW

*Review of the Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)*

The duties of the district court in connection with a Report and Recommendation of a Magistrate Judge are set forth in Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1). When a party objects to a Report and Recommendation, "[a] judge of the [district] court shall make a de novo determination of those portions of the [Report and Recommendation] to which objection is made." 28 U.S.C. § 636(b)(1). A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Fed. R. Civ. P. 72(b); *see also* 28 U.S.C. § 636(b)(1).

*Review of the Petition pursuant to 28 U.S.C. § 2254(d)*

In this case, review of the Petition is governed by the framework of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") because the Petition was filed in 2010, well after the Act's effective date. *See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). As amended by AEDPA, 28 U.S.C. § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

"Although AEDPA's scheme is complex, and its provisions have been subjected to multiple, sometimes conflicting, interpretations, this much is clear: deference to state court determinations must follow an adjudication on the merits." *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 784-85 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) (holding that when a state court rejects some claims on the merits but does not expressly address a federal claim, there is a presumption subject to rebuttal that the state court also adjudicated the federal claim on the merits). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

Under 28 U.S.C. § 2254(d)(1), a state court decision is "contrary to" clearly established precedent if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (quotation omitted). A decision is an "unreasonable" application if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407-08. "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.... Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

Under 28 U.S.C. § 2254(d)(2), "[f]actual determinations by state courts are

presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## DISCUSSION

Petitioner alleges that the trial court's instructions to the jury regarding voluntary intoxication were misleading, violating his Fifth and Fourteenth Amendment due process rights. Petitioner contends the trial court should have clarified its instructions so the jury was aware that it could consider Velasquez's intoxication and any affect it may have had on Petitioner's state of mind. Petitioner further contends that the instructions precluded the jury from considering whether Velasquez's intoxication caused Petitioner to act in self-defense or as a result of being provoked.

The California Supreme Court summarily denied Petitioner's appeal, which is presumed to be an adjudication "on the merits" within the meaning of AEDPA. *See Harrington*, 131 S. Ct. at 784-85. This Court must "look through" the California Supreme Court's summary denial and review the state court's last reasoned decision, which is the California Court of Appeal's written decision on direct appeal. *See id.*; *Ylst*, 501 U.S. at 803 ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

//

## I.     Decision of the California Court of Appeal

The Court of Appeal rejected Petitioner challenge to the jury instructions on the following grounds: (1) the instruction related only to the voluntary intoxication of

Petitioner, not Velasquez, and a reasonable jury would not have read the instruction to limit its consideration of evidence of Velasquez's intoxication; and (2) even if the trial court had erred with the jury instruction, any such error was harmless because no evidence was introduced suggesting that Velasquez provoked Petitioner. (Lodgment 6 at 9-11).

## II.     Recommendation of the Magistrate Judge

The Magistrate Judge recommended that the Petition be denied because "Petitioner's theory that Velasquez must have been the aggressor due to his intoxication was fully available for the jury to consider had there been any evidence before them to support it." (ECF No. 16 at 16). The Magistrate Judge concluded that the California Court of Appeal reasonably decided that the trial court's tailored version of CALCRIM No. 625 did not limit the jury from considering any evidence that Velasquez provoked Petitioner. The Magistrate Judge concluded that the California Court of Appeal reasonably decided that "the instruction to consider 'all circumstances as they were known or appeared' to Petitioner ... placed no limit on the jury's consideration of Velasquez's intoxication and how that intoxication might have caused Petitioner to act in self-defense." *Id.* (quoting Lodgment 6 at 10). The Magistrate Judge concluded that, "[e]ven if Petitioner were to show that the trial court erred by not specifically instructing the jury about Velasquez's intoxication," Petitioner has not shown that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citing *Brecht*, 507 U.S. at 637–38).

Petitioner objects to the Report and Recommendation on the following grounds: (1) "the Magistrate incorrectly concluded that the challenged language in Cal. Crim. 625, considered in context, only related to Petitioner's voluntary intoxication, that the limitation expressed in the voluntary intoxication instruction would not have misled the jury with respect to Valasquez's intoxication;" (2) "the Magistrate err[ed] in concluding that by reading all the jury's instructions together a reasonable jury would not understand the challenged language as limiting its ability to consider evidence of

1  Velasquez's intoxication;" (3) "the Magistrate erred by stating that there was no
2  evidence Velasquez was the aggressor or that Velasquez did anything to provoke
3  Petitioner or cause Petitioner to reasonably or unreasonably believe he needed to act in
4  self-defense;" (4) "the Magistrate incorrectly stated that the trial court instructed the
5  jury to consider evidence that Velasquez provoked Petitioner when determinating ...
6  Petitioner's degree of legal culpability;" and (5) "the Magistrate incorrectly states that
7  the trial court did not err by specifically instructing the jury about Velasquez's
8  intoxication, and that Petitioner had not shown that the error had a substantial and
9  injurious effect or influence in determining the jury's verdict." (ECF No. 20 at 2-8).

## III.  Analysis

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Id.* A criminal defendant's due process right to a trial requires that they be given a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Matthews v. United States*, 485 U.S. 58, 63 (1988).

"Federal habeas courts ... do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the CALJIC model. The only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle*, 502 U.S. at 62 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973)); *see also Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional right]"). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions

as a whole and the trial record." *Estelle*, 502 U.S. at 62 (quoting *Cupp,* 414 U.S. at 147). Even where error is found, a federal habeas petitioner is not entitled to relief from a trial error unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The Ninth Circuit has interpreted "substantial or injurious effect" as meaning the petitioner would have received a more favorable result absent the error. *Bains v. Cambra*, 204 F.3d 964, 971 n.2 (9th Cir. 2000).

The Court has reviewed Petitioner's objections. The Court has reviewed the trial court's instructions to the jury in the context of the entire record. The Magistrate Judge correctly explained that no evidence was presented at trial to suggest that Petitioner was provoked by Velasquez or that Petitioner acted against Velasquez in self-defense. Absent any such evidence, the Court does not find that the trial court's instructions, even if erroneous, "so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147. Accordingly, the Court of Appeal's decision to deny relief from the trial court's jury instructions was neither contrary to, nor an unreasonable application of, clearly established federal law. The Court adopts the recommendation of the Magistrate Judge to deny relief.

## CERTIFICATE OF APPEALABILITY

A certificate of appealability must be obtained by a petitioner in order to pursue an appeal from a final order in a § 2254 habeas corpus proceeding. *See* 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). It must appear that reasonable jurists could find the district court's assessment of the petitioner's constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S.

473, 484-85 (2000). The Court concludes that jurists of reason could not find it debatable whether this Court was correct in denying the Petition. The Court denies a certificate of appealability.

## CONCLUSION

IT IS HEREBY ORDERED that the Report and Recommendation (ECF No. 16) is ADOPTED in its entirety. The Petition for Writ of Habeas Corpus (ECF No. 1) and Application for Certificate of Appealability (ECF No. 19) are DENIED. The Clerk of the Court shall close this case.

DATED: September 20, 2013

**WILLIAM Q. HAYES**
United States District Judge